**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**HELEN ADKINS,**

      **Plaintiff,**

**v.**                                **Case No.: 3:10-cv-01114**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 11, 12, and 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 7 and 8).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**     **Procedural History**

Plaintiff, Helen Adkins  (hereinafter "Claimant"), filed an application for SSI on March 14, 2006, alleging that she became disabled on September 1, 1989 due to

chronic neck pain, bursitis, fibromyalgia, carpal tunnel syndrome, cubital tunnel syndrome, irritable bowel syndrome, and depression. (Tr. at 33–39).[1] The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 14). Thereafter, Claimant requested an administrative hearing, which was conducted on February 7, 2008 by the Honorable Algernon W. Tinsley, Administrative Law Judge (hereinafter "ALJ").  (Tr. at 24-60). By decision dated April 25, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-23). The ALJ's decision became the final decision of the Commissioner on July 30, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5).  Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 9, 10, 11, 12, and 13). Consequently, the matter is ripe for resolution.

## II.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

---

[1] In addition to the present application, Claimant previously filed SSI applications on June 19, 1997, July 31, 2001, March 25, 2004, and April 25, 2005. Each of these applications was denied at the initial level and not appealed further. (Tr. at 14).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work

3

experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3).  The Regulation further specifies how

the findings and conclusion reached in applying the technique must be documented

at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination
> and laboratory findings, the functional limitations that were considered
> in reaching a conclusion about the severity of the mental
> impairment(s).  The decision must include a specific finding as to the
> degree of limitation in each functional areas described in paragraph (c)
> of this section.

20 C.F.R. § 416.920a(e)(2).

In the present case, at the first step of the sequential evaluation, the ALJ found

that Claimant had not engaged in substantial gainful activity since March 14, 2006,

the date of the application for benefits. (Tr. at 16, Finding No. 1).  Turning to the

second step of the evaluation, the ALJ determined that Claimant had the following

severe impairments: right carpal tunnel syndrome, right cubital tunnel syndrome,

fibromyalgia, cervical and lumbar degenerative disk disease, enthesopathy,[2]

gastroesophageal reflux disease ("GERD"), and a right forearm cyst.  (Tr. at 16,

Finding No. 2). The ALJ further concluded that Claimant's rhinitis, bronchitis and

depression were not severe. (*Id.*). Under the third inquiry, the ALJ determined that

Claimant did not have an impairment or combination of impairments that met or

medically equaled any of the impairments detailed in the Listing. (Tr. at 18, Finding

No. 3). Accordingly, the ALJ assessed Claimant's residual functional capacity

(hereinafter "RFC"), finding as follows:

> [C]laimant has the residual functional capacity to perform light work as
> defined in 20 CFR 416.967(b) except: may lift and/or carry 10 pounds
> frequently and 20 pounds occasionally; may stand/walk about 6 hours
> in an 8-hour work day; may sit about 6 hours in an 8-hour work day;

---

[2] Enthesopathy is an arthritic condition affecting tendons and ligaments rather than joint membranes. *Mosby's Medical Dictionary,* 8th Edition, 2009.

may occasionally climb, balance, stoop, kneel, crouch or crawl; and must avoid concentrated exposure to extreme heat, extreme cold, vibration and hazards (machinery, heights, etc.).

(Tr. at 18, Finding No. 4).

The ALJ then analyzed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 21–23, Finding Nos. 5-9). The ALJ considered that (1) Claimant had no past relevant work experience; (2) she was born on June 2, 1971, and at age 34, was defined as a younger individual age 18-49 (20 CFR 416.963); (3) she had a high school education and could communicate in English; and (4) transferability of job skills was not material to the disability determination because Claimant did not have past relevant work experience. (Transcript at 21, Finding Nos. 5-8).  Based on the testimony of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy, such as a router clerk, counter clerk, grader sorter, or hand finisher. (Tr. at 22, Finding No. 9). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 23, Finding No. 10).

### III.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.   In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

6

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson, supra* at 775*.*

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

**IV.** **Claimant's Background**

Claimant was 34 years old at the time she filed her application for benefits and 36 years old at the time of her administrative hearing. (Tr. at 21). While in her twenties, Claimant worked briefly as a waitress and telemarketer.  (Tr. at 31–32). Claimant had a high school education, was proficient in English and basic math, and had no history of vocational training. (Tr. at 30–32).

**V.** **Relevant Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment

and evaluations to the extent that they are relevant to the issues in dispute.

### A.    <u>Treatment Records</u>

In 1986, at age fourteen, Claimant sought treatment at Scott Orthopedic Center ("Scott Orthopedics") for neck, right shoulder, and right arm pain secondary to a sleigh accident. (Tr. at 471). Her condition improved with physical therapy. (Tr. at 469). In October 1986, Claimant fell off a moped and exacerbated her pre-existing shoulder injury. (Tr. at 466). Dr. Colin Craythorne at Scott Orthopedics examined Claimant after the fall and felt that she required only minimal treatment. Dr. Craythorne believed that the injury would resolve on its own. (*Id.*). Contrary to his expectations, Claimant's symptoms persisted. (Tr. at 461). Although she was examined by several physicians, no one could explain the source of her continued pain. The records indicate that Claimant had a normal range of motion in her shoulder and no objective clinical findings. Diagnostic studies also failed to identify a cause for her discomfort. (Tr. at 457).

In early 1989, Claimant returned to Scott Orthopedics with complaints of a mass in her right shoulder that had been present for a month. (Tr. at 450). She was examined by Dr. Earl Foster, who diagnosed the mass as a ganglion cyst.[3] Dr. Foster did not feel that immediate treatment was required and suggested that they monitor the cyst for changes. (*Id.*). Claimant continued to complain of pain and spasm at the site of the cyst; accordingly, Dr. Dan Carr, another specialist at Scott Orthopedics, decided to remove the cyst. He scheduled Claimant to undergo surgery on April 12, 1989. (Tr. at 170). Prior to surgery, Dr. Carr took Claimant's complete medical

---

[3] A ganglion cyst is a fluid filled lump that most commonly develops along the joints and tendons of the hand and wrist. In many cases, a ganglion cyst causes no pain and requires no treatment. Often, it will go away on its own. *www.MayoClinic.com* 2011.

history, noting that her shoulder had been bothering her for three years although no limitation in movement was apparent. (Tr. at 172). Other than shoulder pain, Claimant's medical history was described as "unremarkable" (*Id.*).   The surgery proceeded without complication, and Claimant did well post-operatively except for episodes of shoulder pain and soreness.  (Tr. at 440).

In December 1989, Claimant began physical therapy at the recommendation of Dr. Carr and progressed well. (Tr. at 432-433). Despite overall improvement, Claimant's shoulder pain persisted to some degree, waxing and waning over the following years.

In November 2000, Claimant began treatment with Dr. Luis Bolano of Scott Orthopedics. (Tr. at 419-420). Claimant reported neck, right shoulder, and right arm/hand pain, all of which had been present for a while, but had increased in severity in the prior six months. Dr. Bolano examined Claimant and diagnosed cubital tunnel syndrome and carpal tunnel syndrome.[4] (*Id.*). He ordered a nerve conduction study that revealed a mild right ulnar neuropathy at the elbow.  (Tr. at 415-416). Dr. Bolano initiated treatment of the conditions with injections, which provided Claimant with short-term relief.  Nevertheless, when Claimant's symptoms returned, Dr. Bolano recommended surgery.  (Tr. at 414). On January 26, 2001, Dr. Bolano performed a right carpal tunnel release and right cubital tunnel release on Claimant. (Tr. at 181–82). At first, Claimant had a good result from the procedures;

---

[4] Carpal tunnel syndrome, the most common nerve entrapment syndrome, is a progressively painful arm and hand condition caused by entrapment of the median nerve in the carpal tunnel of the wrist. Carpal tunnel syndrome can cause sensory loss, numbness, and even wasting along the median nerve distribution of the hand. Cubital tunnel syndrome is a similar group of symptoms that occur from compression of the ulnar nerve within the cubital tunnel of the elbow.  *Stedman's Medical Dictionary* 2006.

however, her symptoms eventually recurred and localized in her elbow. (*Id.*). After trying conservative therapies, which did not significantly improve Claimant's condition, Dr. Bolano repeated the release procedures on January 14, 2003. (Tr. at 191–92).

In July 2005, Claimant established a primary care relationship with the providers at University Physicians & Surgeons, Inc. ("UP&S").  Over the next two years, she received care from UP&S for conditions including fibromyalgia, GERD, depression, and rhinitis. (Tr. at 239, 241–47, 352–53, 355–58).  During a January 24, 2006 visit with Dr. Shannon Watts of UP&S, Claimant reported that she had been diagnosed with fibromyalgia in the past and was prescribed Tylenol 3 for her pain. Claimant indicated that Tylenol 3 worked well, but also stated that she required 30 pills each week for successful pain relief.  (Tr. at 243).  Dr. Watts advised Claimant that anti-depressants, good sleep habits, and exercise were keys to overcoming fibromyalgia. Dr. Watts noted that Claimant appeared to understand this advice, but did not seem very motivated to implement it. (*Id.*).  Instead, Claimant wanted narcotic pain medications to control her symptoms.

On September 2, 2005, Plaintiff presented to Tri-State Rehab Services of Westmoreland for physical therapy at the suggestion of Dr. Bolano. Claimant reported persistent cervical pain, which was ongoing for approximately five years and averaged 7 out of 10 on the standard pain scale.  She complained that the neck pain also extended bilaterally into her hands. (Tr. at 349–50). At her initial visit, her rehabilitation potential was rated as "fair" by the rehabilitation therapist. (Tr. at 350). However, six weeks later, Claimant's rehabilitation therapist noted that Claimant had failed to regularly attended therapy sessions, causing her progress to be slow. (Tr. at

347). The therapist reiterated to Claimant the importance of complying with the therapy plan and advised Claimant that she would be discharged from the program if she failed to faithfully attend her scheduled appointments.  After that conversation, Claimant apparently did not return to Tri-State Rehab Services until March 2007, when she attended a few sessions at the request of providers at Scott Orthopedics. (Tr. at 344).

Between February 15, 2006 to March 29, 2006, Claimant received treatment from Dr. Elizabeth Hay Martin at Westmoreland Chiropractic Center. (Tr. at 255–269). At her initial evaluation on February 15, Claimant complained of pain in her right arm; a cyst in her right shoulder; right leg, hip and mid to low back pain; pain between her shoulder blades; and irritable bowel syndrome. (Tr. at 255). Dr. Martin found restrictions in Claimant's cervical range of motion and lumbar flexion, as well as shoulder abnormalities. On March 29, 2006, Dr. Martin completed a written assessment of Claimant's condition at the request of the West Virginia Disability Determination Section ("DDS"). Dr. Martin opined that Claimant's "present condition prevents her from lifting, bending, and stooping without adding stress to her spine." (Tr. at 259). She also noted that Plaintiff exhibited loss of gripping function in her right arm due to previous surgeries. (*Id.*).

Claimant returned to Dr. Bolano on April 5, 2006 with a right forearm mass. (Tr. at 384). Dr. Bolano thought the mass was benign, but ordered an MRI of Claimant's right forearm. The MRI was completed and interpreted to be unremarkable.  (Tr. at 383).   According to the radiologist, there was no focal soft tissue abnormality in the location of the mass.  The tendons, vessels, and underlying marrow at that location were unremarkable as well.  (*Id.*).

11

Claimant revisited Scott Orthopedics on January 8, 2007 and was seen by Michael P. Riddle, a certified physician's assistant. (Tr. at 380–82). Claimant reported back pain of one year's duration, which improved with rest and was exacerbated by climbing stairs. (*Id.*). Claimant's range of motion and muscle strength in her arms and legs were evaluated and determined to be normal. (Tr. at 381). Claimant's lumbar spine was found to have some areas of tenderness, but Mr. Riddle determined that Claimant's reflexes were normal and all of her neurological tests were normal (*Id.*).  X-rays revealed mild osteoarthritic changes, but showed no bony or soft tissue abnormalities.  Mr. Riddle prescribed tramadol for the back pain and recommended physical therapy.  (*Id.*).

On January 11, 2007, Claimant saw Dr. Bolano for complaints of right arm pain with swelling and numbness, tingling and weakness of the forearm. (Tr. at 378–79).  Upon examination, Dr. Bolano found mild tenderness of the medial forearm with no distinct mass.  He palpated a nodular, which was suggestive of a scar. (*Id.*) Claimant's sensation and range of motion were determined to be normal. (*Id.*). Dr. Bolano reviewed Claimant's MRI and X-rays of her upper extremities, which confirmed the absence of abnormalities of Claimant's right elbow and forearm. (*Id.*). Dr. Bolano diagnosed capsulitis and recommended non-surgical treatment for Claimant.  He advised her to continue her current therapy and engage in activity as tolerated. (*Id.*).  No follow-up appointment was scheduled; instead, Claimant was instructed to return as needed.

Some six months later, on July 31, 2007, Dr. Bolano wrote a letter at the request of Claimant commenting on the status of her right arm.  Dr. Bolano stated in the letter, "[t]he patient is having a lot of weakness due to her diagnosis and is unable

12

to work, drive, and any other strenuous activity due to this weakness." (Tr. at 376).

**B.**   **Agency Assessments**

On May 26, 2005, Claimant was evaluated by Emily Wilson, a licensed psychologist. (Tr. at 198–200). Ms. Wilson noted that Claimant's chief complaints were "[f]ibromyalgia and a degenerative disk in her neck." (Tr. at 198). Claimant reported poor appetite, loss of energy, poor sleep, and occasional feelings of worthlessness, which she attributed to her health rather than her "mood." Ms. Wilson conducted a mental status examination and diagnosed Claimant as suffering from an adjustment disorder with depressed mood, chronic. (Tr. at 199). Nonetheless, Ms. Wilson found that Claimant's interactions were within normal limits in terms of social functioning, ability to concentrate, memory, and judgment. Her prognosis was fair. (Tr. at 199-200).

Ms. Lisa Tate, a Masters level psychologist, performed an additional psychological assessment of Claimant on May 22, 2006. (Tr. at 270). Ms. Tate documented that Claimant had no history of psychological treatment, substance abuse, or legal problems and her mental status examination was entirely normal. Claimants described periods of intermittent anxiety during the previous five years, which she felt were related to her inability to work and financial problems. Claimant reported that she could independently attend to her grooming needs; she cooked, did laundry, and cleaned her house; she did the grocery shopping and banking; she routinely visited with her mother; and she generally cared for her family, including her husband and twelve year old daughter. Ms. Tate diagnosed Claimant as suffering from anxiety disorder, not otherwise specified, but noted that Claimant's memory, judgment, and social functioning ability were within the normal diagnostic limits.

13

(Tr. at 273).

On June 10, 2005, Claimant underwent a consultative physical examination performed by Dr. Drew Apgar. (Tr. at 201-16). Dr. Apgar found that Claimant suffered from chronic pain syndrome as a result of carpal tunnel syndrome, cubital tunnel syndrome, and degenerative disc disease. (Tr. at 211). Further, Dr. Apgar noted that Claimant's grasp bilaterally was diminished, but otherwise Claimant's coordination and abilities to pinch and manipulate objects were normal. (*Id.*). No significant compromise of range of motion or joint abnormality was noted. (*Id.*).  He opined that Claimant would have no difficulty with standing, walking, sitting, hearing, speaking, and traveling. However, he felt she might have some difficulty with lifting, carrying, pushing, pulling, or handling objects with her dominant hand. (Tr. at 212).

On July 7, 2006, Dr. Apgar performed a second physical examination of Claimant to update her status for DDS. (Tr. at 290-306). Similar to his first evaluation, Dr. Apgar found that Claimant suffered from fibromyalgia, degenerative disc disease, depression and anxiety by history. (Tr. at 292). This time, when examining Claimant's upper extremities, Dr. Apgar determined that Claimant had 5/5 muscle strength bilaterally; intact grasp bilaterally; intact fine coordination, pinch and manipulation bilaterally; and no joint abnormality.  In addition, her range of motion was not significantly compromised. Dr. Apgar confirmed that despite Claimant's underlying diagnoses, she should have no difficulty standing, walking, sitting, hearing, traveling or speaking.  Moreover, contrary to his first evaluation, Dr. Apgar found no limitations in the use of Claimant's dominant hand or her ability to lift, carry, push, or pull. (301-02).

14

Based upon the results of these physical and psychological examinations, agency medical consultants were asked to complete Physical Residual Functional Capacity Assessments and Psychiatric Review Techniques concerning Claimant. (Tr. at 217–24, 309–16, 333–40).  On June 22, 2005, Dr. Fulvio Franyutti found that Claimant was partially credible and that her claims of chronic pain were partially substantiated. (Tr. at 219). Dr. Franyutti reviewed the results of Dr. Apgar's initial consultative examination and opined that Claimant's RFC was limited to "light" exertional activities. He also noted that Claimant suffered from some postural and environmental limitations. (Tr. at 222-224). A contemporaneous Psychiatric Review Technique completed by Phillip Comer, Ph.D., indicated that Claimant's mental impairment was not "severe" and that she had the mental capacity to perform substantial gainful activity subject to any physical limitations detailed in the RFC assessment. (Tr. at 237).

On July 22, 2006, Dr. Franyutti completed a second physical RFC assessment for Claimant based upon Dr. Apgar's updated physical evaluation. Dr. Franyutti revised his assessment of Claimant's capabilities, opining that she was able to perform work at the "medium" exertional level, with some environmental and postural limitations.  (Tr. at 309-316).  He again found Claimant to be only partially credible and expressly disagreed with Dr. Martin's observation that Claimant could not bend, lift, or stoop. (Tr. at 315-16).   A third physical RFC assessment was completed on October 3, 2006 by Dr. Amy Wirts.  (Tr. at 340).  Dr. Wirts' conclusions were similar to those of Dr. Franyutti, although she opined that Claimant was restricted to "light" exertional work with additional postural and environmental limitations. (Tr. at 334-347).

In follow-up to Ms. Tate's 2006 psychological examination, Joseph Shaver, Ph.D., completed an updated Psychiatric Review Technique on June 2, 2006.  Dr. Shaver's opinions were consistent with the earlier review completed by Dr. Comer. (Tr. at 288). In the comments section of the form, Dr. Shaver stated, "It is believed that [Claimant] possesses the mental capacity to maintain gainful employment on a sustained basis." (*Id.*).  A final Psychiatric Review Technique was completed by Holly Cloonan, Ph.D. on September 30, 2006. (Tr. at 319-332). Like the others, Dr. Cloonan assessed Claimant's mental impairments to be "non-severe." (*Id.*).

## VI.   Claimant's Challenges to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because the ALJ: (1) failed to properly consider the opinion of treating sources; (2) failed to consider Claimant's impairments in combination; and (3) made a faulty credibility determination (Pl.'s Br. at 9–15). In response, the Commissioner argues that substantial evidence supports the ALJ's decision that Claimant is not disabled because the ALJ: (1) properly considered the opinion of the treating sources in light of all available medical evidence; (2) specifically considered Claimant's impairments in combination; and (3) properly determined Claimant's credibility using the two step process outlined in the Social Security regulations. (Def. Br. at 12–20).

## VII.   Analysis

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions as lacking merit.  Additionally, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A.    ALJ's Consideration of the Opinion of Treating Sources

Claimant first argues that the ALJ failed to properly consider the opinions of treating sources Dr. Luis Bolano and Dr. Elizabeth Hay Martin. (Pl.'s Br. at 8–10). For the reasons that follow, the Court finds this argument unpersuasive.

Title 20 C.F.R. § 416.927(d) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. An "accepted medical source" is a licensed physician; licensed or certified psychologist; licensed optometrist for eye disorders; licensed podiatrist for foot disorders; and qualified speech pathologists for speech disorders. 20 C.F.R. 416.913(a). In general, the Social Security Administration will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 416.927(d)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2008).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 416.927(d)(2). If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the factors listed in 20 C.F.R. § 416.927(d)(2)-(6). These factors

17

include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit's ruling in *Mastro v. Apfel* provides the framework for determining the evidentiary weight to be accorded to a treating physician's opinion:

> "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, according to the regulations promulgated by the Commissioner, a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R § 416.927. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig,* 76 F.3d at 590. *Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence.*

270 F.3d 171, 178 (4th Cir. 2001) (emphasis added). When a treating source's opinion is not given controlling weight, and the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources. . ." 20 C.F.R. § 404.927. The regulations state that the

18

Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 416.927(d)(2).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions.  20 C.F.R. § 416.927(e).  In both the aforestated regulations and Social Security Ruling 96-5p, the SSA addresses how medical source opinions are considered when they encroach upon these "reserved" issues; for example, opinions on "whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is;. . . . and whether an individual is 'disabled' under the Social Security Act. . ." Opinions concerning issues reserved for the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p at 2.  However, these opinions must always be carefully considered and "must never be ignored."  *Id.*

Opinions of "other sources" are also considered differently than opinions of accepted medical sources.  Other sources include health care providers such as nurse practitioners, chiropractors, physicians' assistants, naturopaths, audiologists, and therapists; educational personnel; social welfare personnel; and other non-medical sources like relatives, friends, clergy, caregivers, and neighbors. 20 C.F.R. § 416.913(d). These opinions are not used to establish the existence of a medically

determinable impairment, but may be considered by the ALJ in ascertaining the severity of a claimant's impairments and their effect on the claimant's ability to work. Other source opinions are not entitled to controlling weight. (*Id.*).

With this legal framework in mind, the Court scrutinized the ALJ's review of the relevant treating source opinions and verified that the ALJ correctly assessed the opinions in light of (1) the evidentiary weight allocated to those kinds of opinions; (2) the objective medical data; and (3) the opinions of the examining consultants. Claimant challenges the ALJ's "dismissal" of Dr. Bolano's records; specifically, the ALJ's rejection of Dr. Bolano's July 31, 2007 letter in which he opined that Clamant could not work. Claimant argues that she had a longstanding treatment relationship with Dr. Bolano, so he was in the best position to judge "her ability to utilize her arms." To the contrary, Dr. Bolano's letter opining that Claimant was "unable to work" was not entitled to controlling weight, or even special significance, because it addressed an issue reserved to the Commissioner. Accordingly, the ALJ was under no obligation to afford that opinion more than passing consideration; the ALJ acted well within his discretion when he allocated minimal weight to it. Claimant similarly contends that as a treating source, Dr. Martin's opinion that Claimant could not lift, bend, or stoop should have been entitled to more weight than the opinions of non-treating agency consultants. However, as Dr. Martin provided only an "other source" opinion, the ALJ was not required to assess it in the same manner as an opinion from an acceptable medical source. Moreover, the ALJ expressly explained why he discounted the opinion of Dr. Martin, pointing out that the medical records documenting Claimant's condition after she left Dr. Martin's care confirmed that the severity of Claimant's musculoskeletal symptoms had decreased. (Tr. at 20).

20

i.     **Dr. Bolano**

According to Claimant, the ALJ rejected Dr. Bolano's opinions in favor of non-treating sources. While it is true that the ALJ declined to adopt Dr. Bolano's July 31 opinion, it is equally true that the ALJ substantially relied upon the remaining treatment records prepared by Dr. Bolano. As such, the factual premise underlying Claimant's challenge is simply incorrect. The ALJ expressly acknowledged that Dr. Bolano treated Claimant for carpal tunnel and cubital tunnel syndrome over a period of several years. The ALJ based his determination of Claimant's RFC in part on Dr. Bolano's recorded assessments, noting that he had diagnosed Claimant with a right forearm mass and capsulitis, decreased sensation in the extremities on nerve conduct study, and cervical radiculopathy. (Tr. at 20).  Similarly, when establishing the existence of jobs in the national economy that Claimant could perform in spite of her physical limitations, the ALJ incorporated in the hypothetical questions he posed to the vocational expert some of the limitations observed by Dr. Bolano. (Tr. at 22). Therefore, contrary to Claimant's contention, the ALJ did not disregard Dr. Bolano's opinions *in toto*; instead, the ALJ accepted Dr. Bolano's treatment records and documented findings and rejected only his opinion on Claimant's ability to work.  The Court finds the ALJ's decision on this matter is supported by substantial evidence. Dr. Bolano's July 31 letter lacked any substantive explanation for his opinion, failing to identify objective radiological, laboratory, or other clinical data in its support.  As the ALJ emphasized in his decision, Dr. Bolano's most recent office note recorded only mild symptoms in Claimant's back and arms. Rather than describing a worsening condition, the office record indicates that after Claimant's surgeries, her arm returned to normal, with good motor strength throughout; her right forearm had

21

no distinct mass; and her sensation and range of motion was unrestricted. (Tr. at 378, 381). In addition, the MRI ordered by Dr. Bolano confirmed that there were no abnormalities in Claimant's right forearm. (Tr. 383). He did not recommend further surgery; instead, Dr. Bolano recommended only conservative therapy, with activity as tolerated, and told Claimant to return to his office as needed. (Tr. at 378-379). Nothing in the clinical findings documented by Dr. Bolano support his radical conclusion that Claimant was unable to work.

In addition to the lack of significant findings in Dr. Bolano's notes, the results and observations contained in Dr. Apgar's thorough examination record and the three RFC evaluations of Claimant support the ALJ's determination that Claimant is able work. In all three evaluations, the reviewing physicians found that Claimant could engage in some level of exertional activity, either "light" or "medium." (Tr. at 217–24, 309–16, 333–40). Claimant's last RFC assessment prior to the administrative hearing, which was completed on October 3, 2006 by Dr. Amy Wirts, confirmed that Claimant could occasionally carry 20 pounds; frequently lift 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday. (Tr. at 334, 338). Further, Dr. Wirts noted that Claimant was unlimited in her ability to push and pull; was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and should avoid concentrated exposure to extreme cold/heat, vibration, and hazards. (Tr. at 334–37). Giving Claimant the benefit of the doubt, the ALJ ultimately determined that Claimant was restricted to light exertional activity with the nonexertional limitations delineated by Dr. Wirts. This conclusion was wholly supported by the agency experts, the objective medical evidence, and Claimant's reported daily activities. Accordingly,

22

the ALJ acted well within his discretion to reject Dr. Bolano's July opinion.  "[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178.

### ii.  <u>Dr. Martin</u>

Dr. Elizabeth Hay Martin, a chiropractor at Westmoreland Chiropractic Center, treated Claimant for a month and a half over the course of February and March 2006 (Tr. at 255). Dr. Martin found that Claimant's various conditions prevented her from lifting, bending, and stooping without adding stress to her spine. (Tr. at 259). Dr. Martin also noted that Plaintiff exhibited loss of gripping function in her right arm due to previous surgeries. (*Id.*). The ALJ explicitly considered Dr. Martin's opinion and found it "to be extreme particularly since the claimant herself has not alleged this degree of restriction." (Tr. at 20, 22).   The ALJ discounted Dr. Martin's opinion because it was inconsistent with Claimant's description of her daily activities.  The ALJ also observed that "[l]ater notes show improvement after surgery and therapy and do not indicate a degree of persistence and severity to support such total restrictions."  (Tr. at 20).  Moreover, the ALJ was not bound to give Dr. Martin's opinion any special weight, even though she was a treating source.  Dr. Martin, as a chiropractor, is defined as an "other source," whose opinions "may" be considered in making a determination of a claimant's disability status, but are not entitled to significant or controlling weight. 20 C.F.R. § 416.913(d); *Lee v. Sullivan*, 945 F.2d 687, 691 (4th Cir. 1991) (noting that a chiropractor's assessment can only qualify as a layman's opinion because he is not an "acceptable medical source" under the regulations and therefore cannot make a "medical assessment" on a Social Security claimant's "ability to do work-related activities such as sitting, standing, moving

about, lifting, carrying, handling objects, hearing, speaking and traveling."). In view of the extensive medical records available to the ALJ that conflict with Dr. Martin's opinion, as well as the fact that Dr. Martin is not an acceptable medical source, the ALJ's decision to disregard Dr. Martin's opinion was consistent with the applicable regulations.

### B.   Impairments Individually and in Combination

Claimant next argues that the ALJ failed to consider Claimant's impairments individually and in combination. Specifically, Claimant argues that the ALJ ignored the severity of her right arm restrictions, disregarded her history of migraine headaches, and underestimated the impact of her depression on her ability to work.

As the Fourth Circuit Court of Appeals stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989).   The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity."   *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974).   The ailments should not be fractionalized and considered in isolation, but considered in

combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

### i.   <u>Arm Complaints</u>

Claimant asserts that "the evidence supports [Claimant's] loss of grip and inability to use the right arm functionally. Dr. Bolano reported [Claimant] had numbness, tingling and radiating pain in that arm." (Pl.'s Br. at 11). Consequently, Claimant argues that in the RFC assessment the ALJ should have included more restrictive limitations on the use of her right arm. However, the findings relied upon by Claimant were made in April 2006. Claimant overlooks more recent medical findings that support the ALJ's RFC assessment with respect to Claimant's use of her right arm.  As stated *supra*, Dr. Bolano's notes from January 2007 reflect that after Claimant's initial complaints, her arm essentially returned to normal, with 5/5 motor strength throughout; her right forearm had no distinct mass; and her sensation and range of motion was unrestricted. (Tr. at 378, 381). The MRI confirmed the absence of any soft tissue abnormality in Claimant's right forearm. (Tr. at 383). The examining consultant and two reviewing physicians reached the same conclusion regarding Claimant's ability to use her arm. Therefore, at the time of the administrative hearing in 2008, the records of Claimant's treating physician (Tr. at 378, 381) and the agency consultants (Tr. at 333–40) were in agreement that Claimant had the use of her arm with improved gripping ability and without any significant limitations on her range of motion. In his decision, the ALJ accepted that

Claimant had some persistent loss of sensation in her arm, but recognized that this condition did not severely restrict her ability to handle and manipulate objects. (Tr. at 21.) For that reason, the ALJ found that a RFC of "light" work with minimal limitations related to Claimant's right arm was appropriate based on the medical evidence available. (*Id.*).   The Court finds this determination to be substantially supported by the evidence.

### ii.   <u>Migraines</u>

Claimant argues that the ALJ entirely ignored her migraine headaches, failing to mention them even as a non-severe impairment. (Pl.'s Br. at 12).  Claimant implies that the lack of discussion in the ALJ's decision regarding migraine headaches proves that the ALJ erroneously overlooked them.   Contrary to Claimant's suggestion, the ALJ took note of Claimant's treatment for headaches. (Tr. at 16).  According to the records, Claimant was treated for a migraine headache in August 2005 and, thereafter, her headaches appeared to be controlled on medication.  (Tr. at 246-247). A diagnosis, by itself, cannot establish disability under the Social Security Act. *See* 20 C.F.R. §416.925(d) (an impairment cannot meet the criteria of a listing based only on a diagnosis). Instead, a claimant must supply evidence to prove that the medically determinable impairment or combination of impairments results in disability. 20 C.F.R. §416.912(a). Here, Claimant failed to present evidence beyond the diagnosis of migraine headache that established how, or if, the headaches limited her ability to engage in substantial gainful activity.   In addition, Claimant's record of migraine headaches was so minimal that the ALJ's limited attention to that diagnosis was both understandable and acceptable. An ALJ is not required to exhaustively discuss every complaint or condition alleged by a claimant.  Without some additional evidence of a

26

chronic functional restriction caused by migraine headaches, the ALJ was hard-pressed to find that they played a significant role in the disability determination.

### iii. <u>Depression</u>

 Claimant argues that the ALJ "dismissed" her depression in his opinion. (Pl.'s Br. at 12). To the contrary, the ALJ fully reviewed and evaluated Claimant's mental health impairments, using the special technique required by the Social Security regulations.  At step two of the sequential evaluation, the ALJ examined the severity of Claimant's mental restrictions in each of the four broad functional categories, known as "paragraph B" criteria, observing that Claimant was mildly restricted in activities of daily living, but had no restrictions in social functioning or concentration, persistence and pace.  Claimant likewise had no episodes of decompensation.  (Tr. at 17-18).  The ALJ also reviewed "paragraph C" criteria and commented that Claimant's impairment did not meet the level of severity set forth in those criteria.  Moreover, despite the ALJ's conclusion that Claimant's mental health impairment was non-severe, he explicitly considered the findings relative to paragraph B criteria in crafting his RFC and questioning the vocational expert. (*Id.*)   Clearly, the ALJ did not "dismiss" the impact of Claimant's mental impairment in his analysis.

The Court finds that the ALJ's conclusion regarding the severity of Claimant's mental impairment was supported by substantial evidence. Claimant underwent two consultative examinations conducted by mental health experts. Three additional experts completed Psychiatric Review Technique Forms. None of these experts found evidence that Claimant suffered a severe mental impairment. (Tr. at 198–200, 270–74, 225–37, 276–89, 319–32). After evaluating Claimant, the examining psychologists found that Claimant was capable of normal social interaction and

suffered from only mild depression. (*Id.*) No consultant found Claimant's depression to be severe enough to limit her ability to engage in substantial gainful activity. (*Id.*). Claimant had no history of mental health treatment, no current treating psychologist or psychiatrist, and no documented episodes of psychiatric crisis or deterioration. She described intermittent anxiety and depression, but never sought more than superficial intervention.  None of her treating physicians suggested hospitalization for her emotional difficulties or referred Claimant to a mental health care specialist. Accordingly, the evidence overwhelmingly established that Claimant's mental impairment was non-severe.

### iv.    <u>Impairments in Combination</u>

Claimant contends that the ALJ failed to properly consider the combined effect of her arm condition, migraines, and depression, stating "[s]ince the ALJ dismissed these impairments, it is evident that he could not have accurately considered the combination of impairments." (Pl.'s Br. at 12). This argument is simply not sustainable when conducting a careful reading of the ALJ's decision.

The ALJ specifically found that "[t]he claimant has the following severe impairments: right carpal tunnel syndrome, right cubital tunnel syndrome, fibromyalgia, cervical and lumbar degenerative disk disease, enthesopathy, gastro-esophageal reflux disease and right forearm cyst. The claimant has not severe: rhinitis, bronchitis and depression (20 CFR 416.920(c))." (Tr. at 16). The ALJ also specifically found that Claimant did not have an impairment *or combination of impairments* that satisfied the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 18 Finding, No. 3) (emphasis added).   In reaching this conclusion, the ALJ identified the listed impairments to which he compared Claimant's

constellation of symptoms and findings, explaining as to each why Claimant did not meet or medically equal the severity criteria of the relevant listings.   (Tr. at 18).

The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude her from engaging in substantial gainful activity is amply supported by the medical record. Other than bald conclusory statements by Dr. Bolano and Claimant's chiropractor, Dr. Martin, no physician or therapist found that Claimant's impairments separately or in combination prevented her from engaging in substantial gainful activity. (Tr. at 201-24, 290-306, 309-16, 333-40). In all three RFC assessments, the reviewing physicians found that Claimant could engage in "light" or "medium" work. (Tr. at 217–24, 309–16, 333–40). At the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the vocational expert to taken into account Claimant's impairments in combination.   He asked the expert to assume that Claimant had the limitations identified by Dr. Wirts in her RFC assessment and then had the expert add the effects of Claimant's mental health impairments. (Tr. at 50–52). Despite being asked to assume all of these limitations, both physical and mental, the vocational expert opined that Claimant could engage in light exertional work, with some non-exertional limitations, and could perform jobs that existed in significant numbers in the economy. (*Id.*).

## C.    Credibility Analysis

The ALJ's conclusion that Claimant's statements regarding disabling symptoms and pain were excessive and not credible is likewise supported by substantial evidence. Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, pursuant to 20 C.F.R. §

416.929, in order to determine their limiting effects on a claimant.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain.   SSR 96-7p.   "[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (quoting *Craig,* 76 F.3d at 591). *See also* 20 C.F.R. § 416.929(c)(3).  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record. *Id.* In performing this evaluation, the ALJ should consider all of the available evidence, including history; laboratory and physical findings; and statements and opinions from treating and non-treating medical sources, as well as statements from the claimant and other sources, such as family members, friends, and employers. *Id.*  In addition, the ALJ may consider such factors as claimant's daily activities; the location, duration, frequency and intensity of symptoms;

precipitating and aggravating factors; medications taken to relieve the symptoms; treatment received for relief of the symptoms; other measures taken to relieve the symptoms; and other factors relating to functional limitations and restrictions. *Id.* The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. *Id.*

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Ruling. 20 C.F.R. § 416.929; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Significant evidence existed in the record that Claimant's complaints of disabling pain and other symptoms did not correlate with the objective medical evidence and with her own description of her daily activities. Claimant complained of intense pain in her

arm that prevented her from writing and depression so bad that she could not get out of bed until the afternoon. (Tr. at 158). However, a January 8, 2007 examination conducted by Claimant's treating physician revealed that Claimant's arms and legs were normal.  The treating physician recommended only conservative treatment and did not place restrictions on Claimant's activities. (Tr. at 381). As the ALJ pointed out, Claimant recent treatment had been minimal and no further surgical intervention was planned.  (Tr. at 19).  She did not require the use of assistive devices, such as braces or a cane, and treated her discomfort by taking hot showers. Dr. Apgar's two consultative examinations similarly contradicted Claimant's assertion that her arm was useless. (Tr. at 201–24, 290–306).  In his second examination, Dr. Apgar noted improvement in Claimant's right arm, indicating that she should have no difficulty with grasp or fine manipulation and could lift and carry. He placed no restrictions on her ability to use her arm and hand. Further, Claimant showed little evidence of debilitating depression or anxiety and never reported to her treating physicians the existence of psychiatric symptoms so marked that they prevented her from functioning normally. Certainly, none of the psychologists who evaluated or assessed Claimant found evidence to support Claimant's allegation of severe, incapacitating depression. Moreover, none of Claimant's treating physicians recommended psychiatric care or psychological counseling.

Further, Claimant's past statements conflicted with each other and with her current assertion of disability. In contrast to a written statement made by Claimant indicating that her depression kept her in bed all morning, Claimant admitted that she woke up at 6:30 AM to get her daughter ready for school, cooked every day, drove, shopped, and did the laundry and dishes. (Tr. at 128-31). The ALJ also found

Claimant to be less than credible because her testimony at the administrative hearing was inconsistent with statements made by her outside of the hearing. For example, Claimant testified at the hearing that her medication did not relieve her symptoms of pain and depression. (Tr. at 39). Yet, the records in evidence contained prior statements by Claimant confirming that her medication did, in fact, improve these symptoms. (Tr. at 126–38). Neither the objective medical evidence, nor the anecdotal evidence contained in the record, substantiated the persistence and intensity of pain and depression alleged by Claimant at the administrative hearing. Therefore, the Court finds that the ALJ properly assessed Claimant's credibility and reached a determination that had substantial evidentiary support.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED:** August 30, 2011.

Cheryl A. Eifert
United States Magistrate Judge